UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LARRY S. FOX,
CYNTHIA ALFORD,
CARL EDWARDS,

                              Plaintiffs,

                                                    DECISION AND ORDER

                                                    10-CV-6240L

             v.

DAVID A. PATERSON,
Governor of New York,

                              Defendant.
_____


        Federal and state law provide procedures for filling vacancies that exist in the United

States House of Representatives ("House").  The procedures envision calling a special election to

fill the vacancy.  The Governor of the State of New York has publicly stated that he plans to call

for a such an election to be held some five months from now, on the date of the general election,

to fill a vacancy that exists in the Twenty-Ninth New York Congressional District ("29th

District").  The issue before this Court is whether a federal judge can order the Governor to

schedule the election sooner, at a time the Court believes best.

        A vacancy now exists in the 29th District because the incumbent Congressman, Eric J.

Massa, resigned his office effective March 9, 2010.[1]  The three plaintiffs, who allege that they are

_____

        [1]The 29th District include parts of Monroe and Ontario Counties and all of Allegany,
Cattaraugus, Chemung, Schuyler, Steuben and Yates Counties.

residents and voters in the 29th District, commenced this action seeking declaratory and injunctive relief against David A. Paterson, the Governor of New York ("Governor").  In sum, plaintiffs seek a mandatory injunction from this Court directing the Governor to call a special election to fill the vacancy in the 29th District.

When the action was originally filed, on May 3, 2010, the Governor had not issued a formal proclamation for a special election and there had been published reports that he was disinclined to do so.

On May 12, 2010, however, while the action was pending, and just prior to the date set for the Governor to file his responses to plaintiffs' injunction motion, the Governor announced in a press release that he would issue a special election proclamation in October, for a special election to be held on November 2, 2010, the same date as the next general election.

Plaintiffs rely, in part, on Article I, § 2, clause 4 of the United States Constitution, which states that "[w]hen vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies."  Plaintiffs now contend that, despite the Governor's stated intention to proclaim a special election this fall, the action is not moot, because the Governor has not formally issued a proclamation for a special election. Plaintiffs contend that this Court should direct him to do so forthwith, so that the special election could be held as soon as possible and well before the general election on November 2.  Plaintiffs contend that their constitutional rights to due process and equal protection and their rights under the First Amendment are being violated by the Governor's delay in issuing the proclamation for a special election.

The date the Governor issues the proclamation or call for a special election is critical because New York law provides a very narrow window within which such an election must be held after issuance of the proclamation. Section 42(3) of the New York Public Officers Law provides that if a vacancy occurs in the House prior to July 1, and if a special election is called to fill that vacancy, it must be held no more than forty days nor sooner than thirty days from the date of issuance of the proclamation. Plaintiffs contend that this Court should compel the Governor to issue the proclamation now, so that the election can be held within the next thirty to forty days. In a nutshell, the Governor contends that he intends to issue the proclamation for a special election and, therefore, that he has fulfilled, or will fulfill, his duties under Article I, § 2, clause 4 of the United States Constitution.

The Governor further contends that the Constitution vests discretion in the Governor as to the timing of issuance of the proclamation for a special election. The Governor contends that Article I, § 4, clause 1 of the United States Constitution, and a federal statute, at 2 U.S.C. § 8(a), provide that the times, places and manner of holding elections for representatives shall be prescribed by the various state legislatures, and that New York law has vested discretion in the Governor as to when a special election may be called. *See* Pub. Off. Law § 42(3). So, the issue now is whether this Court can mandate that the Governor call a special election forthwith, or at least sooner than the time selected by the Governor for holding the special election. Under the circumstances presented here, I do not believe that such a mandatory injunction against the Governor is warranted.

**DISCUSSION**

**I. Preliminary Injunction Standards**

The Court of Appeals for the Second Circuit has explained that,

> [i]n general, the district court may grant a preliminary injunction if the moving party establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.

*Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted).

"However, a plaintiff cannot rely on the 'fair ground for litigation' alternative in challenging 'governmental action taken in the public interest pursuant to a statutory or regulatory scheme.'" *Monserrate v. New York State Senate*, 599 F.3d 148, 154 (2d Cir. 2010) (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)). In such cases, the moving party must establish a likelihood of success on the merits. *Id.*

The bar is raised even higher where, as here, the requested injunction is mandatory in nature–in other words, where the movants seek to compel, rather than prohibit, governmental action. A "district court may enter a *mandatory* preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (citing *No Spray Coalition, Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001)).

**II. The Merits of Plaintiffs' Claims**

**A. Duty to Issue Writ of Election**

As stated, Article I of the Constitution provides, in part, that "[w]hen vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies." In New York, that is accomplished by the governor's "proclamation" of a special election. Section 42(3) of the Public Officers Law provides in part that "upon the occurrence of a vacancy in any elective office which cannot be filled by appointment for a period extending to or beyond the next general election at which a person may be elected thereto, the governor may in his discretion make proclamation of a special election to fill such office ... ."

Notwithstanding Article I's use of the mandatory verb "shall," the Governor appears to contend that on the facts of this case, he is not required to proclaim a special election at all. *See* Def. Mem. of Law (Dkt. #14) at 8-12. I do not agree with that assertion. While there is not a wealth of case law on this precise question, the federal courts of appeals for both the Sixth and Seventh Circuits have held that the Constitution imposes a mandatory duty on a state's chief executive to call a special election to fill a congressional vacancy, although a governor does have some discretion with respect to the *timing* of that election.

In what is still one of the leading cases on this subject, *Jackson v. Ogilvie*, 426 F.2d 1333 (7ᵗʰ Cir. 1970), the Seventh Circuit held that the plaintiffs, who were registered voters in a certain Illinois congressional district, had stated a facially justiciable claim alleging a denial of their constitutional right to representation under Article I, § 2 of the Constitution, based on the allegation that the Governor of Illinois had failed and refused to call a special election to fill a

vacancy that arose upon the death of the plaintiffs' representative in Congress. The Court of Appeals held that the governor "had the duty, at the time of the death of Representative Ronan, to issue a writ of election to fill the vacancy," and that "[t]he Governor's duty ... continued, notwithstanding the fact that delay may eventually render the calling of a special election of so little use that the duty will no longer be enforceable." *Id.* at 1337.

Faced with a similar issue twenty-four years later, the Sixth Circuit reached the same conclusion in *ACLU of Ohio, Inc. v. Taft*, 385 F.3d 641 (6ᵗʰ Cir. 2004). There, one of Ohio's House seats had become vacant on July 24, 2002, due to the expulsion of an Ohio congressman. The governor of Ohio, after consulting with local elected officials, decided not to call a special election, ostensibly because of the cost of holding a special election, the difficulty presented by redistricting that was to take effect for the regularly scheduled election in November 2002, the relatively short length of time an elected replacement could be expected to serve in light of Congress's scheduled adjournment on October 3, 2002, and the uninterrupted continuation of constituent services by the Clerk of the House. *Id.* at 644.[2]

The Court of Appeals held that the district court committed errors of law, and abused its discretion, by failing to award the plaintiffs appropriate equitable and declaratory relief. In so holding, the Sixth Circuit stated, "Like the Seventh Circuit[ in *Ogilvie*], we conclude that Article I, section 2, clause 4 is mandatory, requiring the state's executive to issue a writ to fill a vacancy in the House." *Id.* at 649. The court further held that by deciding not to call a special election at

<hr />

[2]As does the Governor in the case at bar, the parties in *Taft* had contemplated holding a special election on the same date as the general election, November 5, 2002, with the winner of the special election serving from then until the start of the next Congress on January 3, 2003. 385 F.3d at 648 and 649 n.5.

all, the Ohio governor had violated that duty. *Id.* at 650. *See also Valenti v. Rockefeller*, 292
F.Supp. 851, 863 (W.D.N.Y. & S.D.N.Y. 1968) (stating in dictum that "[c]learly [the governor]
must issue a writ of election" to fill a House vacancy, but adding that "it is not clear that Art. I, §
2, cl. 4 ... require[s] the governor to call a *prompt* election") (emphasis added), *aff'd*, 393 U.S.
405 (1969) (mem).

In the case at bar, the Governor contends that a 2005 amendment to 2 U.S.C. § 8 calls
into question the continued validity of the *Ogilvie* and *Taft* decisions. Prior to that amendment, §
8 provided that

> [t]he time for holding elections in any State, District, or Territory for a Representative or
> Delegate to fill a vacancy, whether such vacancy is caused by a failure to elect at the time
> prescribed by law, or by the death, resignation, or incapacity of a person elected, may be
> prescribed by the laws of the several States and Territories respectively.

In 2005, however, Congress designated that provision as subsection (a), inserted the phrase,
"Except as provided in subsection (b) of this section," at the beginning of subsection (a), and
added an entirely new subsection (b), which provides, in part, that "[i]n extraordinary
circumstances, the executive authority of any State in which a vacancy exists in its representation
in the House of Representatives shall issue a writ of election to fill such vacancy by special
election." "Extraordinary circumstances" are defined to exist "when the Speaker of the House of
Representatives announces that vacancies in the representation from the States in the House
exceed 100." 2 U.S.C. § 8(b)(1). With some exceptions, a special election held under subsection
(b) to fill a vacancy in the House is required to take place no later than forty-nine days after the
Speaker of the House announces that the vacancy exists. 2 U.S.C. § 8(b)(2).

The Governor argues that through this amendment, Congress "confirmed that the states retain virtually unfettered discretion" with respect to the holding of special elections, except in the most "extraordinary circumstances." Def. Mem. of Law at 13. To the extent that the Governor contends that Congress meant to confirm the states' discretion regarding *whether* to hold special elections to fill vacancies in the House, I disagree.

An examination of the legislative history of the 2005 amendment indicates that its purpose was to "establish[] a framework for conducting expedited special elections to fill House vacancies resulting from a catastrophic terrorist attack or other extraordinary circumstances," and "to ensure that a functioning House of Representatives would be in place with the ability to operate effectively and with legitimacy in the wake of a potential catastrophic terrorist attack." H.R. Rep. 109-8(I), 2005 WL 548103, at *3. In enacting the amendment, Congress was not concerned with whether, when or how House vacancies should be filled under "ordinary" circumstances. In short, this amendment is of little or no relevance to the issues before me.

## B. Whether the Governor has Complied with the Duty Imposed by Art. I, § 2, cl. 4

The Governor next argues that, if the Court determines that he has a duty under Article I to proclaim a special election, the Court should also find that he has complied with that duty. The Governor contends that he "has called a special election," by making an "explicit and unambiguous announcement that a special election will be held on November 2, 2010 ... ." Def. Mem. of Law at 6. The Governor asserts that he has simply exercised his discretion as to the

timing of the election, by deciding that the special election will be held on the same day as the general election in November.

While at first blush that argument might appear to have some surface appeal, it does not withstand closer scrutiny. The simple fact is that the Governor has *not* proclaimed a special election. He has simply stated, by means of a press release, that he *intends* to do so, several months from now.

While the Public Officers Law does not set forth precisely what constitutes a "proclamation" of a special election, it is evident from the text of the Governor's press release itself that the press release is not such a proclamation. It states, in part, that "Governor Paterson will issue the Special Election Proclamation in October, approximately 30-40 days prior to the Special Election, pursuant to Section 42 of the Public Officers Law." *See* Dkt. #13-2 at 46.[3] In contrast, when the Governor proclaimed a special election on February 23, 2009, to fill a vacancy in the Twentieth Congressional District, he issued a document captioned "PROCLAMATION," and bearing an official seal of the Governor's office, in which the Governor stated, *inter alia*, "I ... do hereby order and proclaim that an election be held" in that district on March 31, 2009. *See* Dkt. #15-2 at 1.

In short, the Governor has not, as yet, fulfilled his duty to issue a writ of election to fill the vacancy in the 29th District, as mandated by Article I, § 2, clause 4 of the United States Constitution. He has merely stated that he intends to do so.

---

[3]The press release is also available on the Governor's official website, http://www.state.ny.us/governor/press/051210SpecialElection.html.

Of course, to say that the Governor has not complied with his constitutional duty does not necessarily mean that he has violated that duty, as plaintiffs allege. That issue concerns the timing of the special election, and specifically whether the Court should order that election to be held sooner than November 2.

## C. Timing of the Special Election

Article I, § 2, clause 4 mandates the calling of a special election to fill the vacancy. But that provision of the Constitution sets no time frame within which the "Executive Authority" or Governor must act.

Therefore, section 2 of Article I must be read in conjunction with section 4, clause 1 of the same article, which states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations ... ." In addition, as explained above, 2 U.S.C. § 8 provides that, except in "extraordinary circumstances" (which do not exist here), "the time for holding elections in any State, District, or Territory for a Representative or Delegate to fill a vacancy ... may be prescribed by the laws of the several States and Territories respectively."

Thus, although the duty to call a special election to fill a vacancy in the House is mandatory, both the Framers of the Constitution and Congress have clearly indicated their intent to leave decisions concerning the *timing* of such elections to the individual states. Both the Sixth Circuit in *Taft* and the Seventh Circuit in *Ogilvie* recognized the broad discretion that has been

left to the states in such matters.  *See Taft*, 385 F.3d at 648, 650 (noting "the considerable discretion given to state government officials to determine election procedures, particularly the discretion to set a time for a special election to replace a Representative," and stating that "legislative balancing between [various factors bearing upon the timing of a special election] is entitled to considerable deference"); *Ogilvie*, 426 F.2d at 1337-38 (stating that while governor "does not have discretion to decide against filling the vacancy," he does have some discretion over the date on which to hold a special election to fill the vacancy).

The case law in this area also suggests that a delay of some months in holding a special election to fill a vacancy in a legislative district does not in itself implicate any fundamental rights of the electors within that district.  For example, in *Mason v. Casey*, No. 91-5728, 1991 WL 185243, at *2 (E.D.Pa. Sept. 18, 1991), the court dismissed claims by two registered voters from a certain congressional district, challenging the constitutionality, as applied, of a state statute providing that a special election to fill a congressional vacancy could not be held until at least sixty days after issuance of the writ.  In *Mason*, that meant that a special election to fill a vacancy in the plaintiff's district, which arose on September 11, 1991, could not be held until after the next general election on November 5, 1991.

The plaintiffs in *Mason* claimed that the state's failure to hold the special election on November 5 would result in a deprivation of their fundamental right to vote and be represented, in violation of the First Amendment, the Equal Protection clause of the Fourteenth Amendment, and the Voting Rights Acts.  The court rejected those claims, stating that although "it [wa]s undeniable that a delay will mean a longer period of time in which voters from the Second

Congressional District remain unrepresented ..., the issue is whether the delay is unconstitutional, and I find that it is not." 1991 WL 185243, at *2. The court added that the plaintiffs' "claim of infringement of a fundamental right is based upon when the election should take place, and that determination is clearly within the wide discretion of the Pennsylvania Legislature and Governor Casey." *Id.*

In *Ogilvie*, the applicable Illinois statutes required at least 162 days, *i.e.* a little over five months, to elapse from the date on which the governor called a special election to the date on which the special election was held. Although the plaintiffs' claims in *Ogilvie* arose out of the governor's complete refusal to call a special election upon the death of the congressman from the plaintiffs' district, rather than the 162-day waiting period itself, the court in *Ogilvie* gave no indication that the state statute mandating that period was unconstitutional. Noting that the plaintiffs had not challenged the constitutionality of the 162-day minimum period, or the state statutes requiring it, the court observed in passing that "control of this element of procedure has been left to the state legislatures." *Id.* at 1335 n.1.

In addition, at the end of its decision, the court discussed the governor's discretion with respect to the timing of the special election, stating that the governor "may prefer one day of the week over another, or cause the special election to *coincide with* or to avoid being held on the *same day as another election.* If the district court determines that affirmative relief should be granted, a decree should be framed in a manner which will *preserve defendant's latitude and discretion in these matters.*" *Id.* at 1338 (emphases added). Thus, the court clearly sought to

ensure that any relief that might be granted by the district court would not encroach upon the governor's discretion as to the timing of the special election.[4]

Although are not on all fours with this case, cases involving temporary appointments to fill legislative vacancies pending an election are of some value here as well, insofar as they implicate some of the same rights and interests asserted by plaintiffs in the case at bar. In *Valenti v. Rockefeller*, for instance, the Supreme Court summarily affirmed a decision by a three-judge district court, sustaining the authority of the Governor of New York to fill a vacancy in the United States Senate by appointment pending the next regularly scheduled senatorial election–a period of over twenty-nine months.[5] In particular, the plaintiffs asserted that the operation of state law under the facts of that case unconstitutionally denied them their right to vote, and that it

---

[4]Because of its particular facts, the *Taft* decision provides little guidance with respect to the length of the allowable delay in holding a special election. The vacancy in *Taft* arose on July 24, 2002, and it appears that both sides agreed that if a special election were held, it would be held on November 5, 2002. 385 F.3d at 649 n.5.

In addition, the Sixth Circuit's decision in *Taft* was issued long after the vacancy had been filled in a general election. The governor in that case did not call a special election, the district court denied the plaintiff's request for injunctive relief and dismissed the case, and a panel of the Sixth Circuit denied emergency injunctive relief pending appeal. Therefore, no special election was held, and the winner of the November 5, 2002 general election took office on January 3, 2003. *See* 385 F.3d at 644-45. In its decision on the merits, which was issued on January 28, 2004, the Sixth Circuit held that: (1) although it was too late to provide appropriate injunctive relief, the court could still award declaratory relief and attorney's fees; and (2) because the injury involved in the case was capable of repetition, while evading review, the case was not moot. *Id.* at 646-47. Thus, the primary focus of the court's decision was whether the governor had a duty to call a special election, not whether any particular time frame for holding such an election was permissible.

[5]The Senate vacancy in *Valenti* occurred in June 1968, upon the assassination of Senator Robert F. Kennedy, and state statutory law mandated that an election to fill the vacancy could not be held until November 1970, as 60 days were required to pass prior to the primary election, and replacement Senate elections were to be held in even-numbered years.

infringed on the principle of popular election of senators declared by the Seventeenth Amendment. The district court held that the New York statutory provisions at issue "d[id] not exceed the discretion conferred on the states by the Seventeenth Amendment with respect to the timing of vacancy elections and the procedures to be used in selecting candidates for such elections," and that "[s]ubstantial state interests [we]re furthered by the decisions of the New York Legislature that Senate vacancy elections be held only in conjunction with regular congressional elections ... ." 292 F.Supp. at 853-54.

Relying in part on *Valenti*, the Supreme Court in *Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982), upheld a Puerto Rico statute which had been interpreted to permit an interim vacancy in the Puerto Rico House of Representatives to be filled by the political party of the legislator who had vacated the seat. The statute allowed the appointee to serve until the term of his predecessor has expired, which in that case was approximately forty months. The plaintiffs had argued that they had a federal constitutional right to elect their representatives and that legislative vacancies therefore were required to be filled by special election.

Rejecting that assertion, the Court noted that "the Constitution 'does not confer the right of suffrage upon any one,' and that 'the right to vote, *per se*, is not a constitutionally protected right.'" *Id.* at 9 (quoting *Minor v. Happersett*, 21 Wall. 162, 178 (1875), and *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 35, n.78 (1973)). The Court recognized that, when a state or the Commonwealth of Puerto Rico does provide for election of state officials, all citizens within the relevant jurisdiction have an *equal* right to participate in the election, but the Court concluded that although Puerto Rico's "choice to fill legislative vacancies by appointment

rather than by a full-scale special election may have some effect on the right of its citizens to elect the members of the Puerto Rico Legislature ..., the effect is minimal, and like that in *Valenti*, it does not fall disproportionately on any discrete group of voters, candidates, or political parties." *Id.* at 12.

Following *Valenti* and *Rodriguez*, a number of courts have upheld interim legislative appointments of substantial duration. *See, e.g., Lynch v. Illinois State Bd. of Elections*, 682 F.2d 93, 95 (7th Cir. 1982) (rejecting plaintiffs' assertion "that the twenty-five month suspension of their right to vote offends the Constitution of the United States," and finding that "the district court failed to give proper deference to the judgment of the Illinois legislature"); *Judge v. Quinn*, 623 F.Supp.2d 933, 940 (N.D.Ill. 2009) (holding that state statute providing for filling of United States Senate vacancy by appointment did not violate plaintiffs' right to vote, and that the nearly two-year period between the vacancy and the next election in that case was not impermissibly long).

Again, those cases do not involve vacancies in the House of Representatives, and accordingly the relevant considerations and interests involved may not be exactly the same as those presented here. *See Taft*, 385 F.3d at 649 n.3 (noting differences between cases involving Senate vacancies and House vacancies) (citing *Valenti*, 292 F.Supp. at 855, 863). Plaintiffs in the case at bar, however, do clearly assert a denial of their purported right to vote and to elect their representative in Congress. *See* Complaint ¶ 24; Plaintiffs' Mem. of Law (Dkt. #3) at 1, 10. As *Rodriguez* makes clear, there is no "right to vote," *per se*. *Rodriguez*, 457 U.S. at 9.[6]  In

_____

[6]The principal case cited by plaintiffs in support of their assertion of such a right, *Ex*

(continued...)

addition, while Article I, § 2, clause 1 does confer a right to vote for one's United States

Representative, inasmuch as it provides that members of the House are to be "chosen ... by the

People of the several States ...," these cases indicate that the mere fact that plaintiffs' exercise of

their right to vote pursuant to Article I will not occur until November 2, 2010 does not give rise

to any constitutional infirmity.

I conclude, therefore, that the Governor has acted within his discretion in deciding to hold

a special election in November of this year, and not sooner, as plaintiffs would prefer.  In that

regard, I note that the Governor has articulated a number of reasons for his decision to wait until

October to issue the special election proclamation.  His May 12, 2010 press release cited "serious

concerns over the rollout of new electronic voting machines in several counties within the [29th]

district, the local financial burden of holding a special election so close to the regular election

cycle, as well as the possible disenfranchisement of overseas military voters who would not be

able to participate ... ."

Consistent with those stated concerns, the Governor in this litigation has submitted

declarations of Assistant Counsel to the Governor Jeffrey H. Pearlman, as well as of

commissioners of elections from Monroe, Ontario and Cattaraugus Counties, explaining some of

the logistical, financial and other difficulties that would be created by conducting a special

---

[6](...continued)
*Parte Yarborough*, 110 U.S. 651 (1884), does not support that assertion.  *Yarborough* involved criminal charges alleging a conspiracy to prevent a black citizen from exercising his statutory right to vote, in violation of the Fifteenth Amendment.  That all citizens have an *equal* right to vote, regardless of their race or color, and may not be discriminated against for exercising, or attempting to exercise that right, does not mean that they have some freestanding "right to vote" in general.

election in the 29th District prior to November 2.  *See* Dkt. ##10-13.  Pearlman, for example, notes that the State of New York ("State") is currently involved in a lawsuit brought against it by the federal government in the Northern District of New York, alleging that the State is not in compliance with the Help America Vote Act ("HAVA"), 42 U.S.C. § 15301 *et seq.*  Dkt. #13 ¶¶ 10-17.  In part, the federal government seeks in that action to compel the State to adopt voting technology, including new voting machines, mandated by HAVA.  *See United States v. New York State Board of Elections*, 312 Fed.Appx. 353, 354 (2d Cir. 2008).  The parties in that action are currently operating under remedial orders entered by District Judge Gary L. Sharpe, with the aim of bringing all counties in New York into full compliance with HAVA by the time of the general election on November 2, 2010.  *See United States v. New York State Board of Elections*, No. 1:06-cv-00263, Dkt. #188, #299 (N.D.N.Y.)  According to Pearlman and the other declarants, some counties within the 29th District are still in the process of converting over to the new technology, and to hold a special election now, before that process is finished, would be cumbersome and difficult.

These declarants also explain why they believe that a special election would be significantly more costly to conduct prior to, rather than on, November 2, when the general election is held.  Poll workers would have to be paid, for instance, voting machines would have to be transported and set up, and paper ballots would have to be printed.  Pearlman Decl. (Dkt. #13) ¶ 27.  In that vein, Pearlman states that the cost of a special election is a particular concern now because the State is currently in the midst of an economic downturn that has resulted in a severe fiscal crisis in state government.  *Id.* ¶ 24.

Plaintiffs take issue with some of the reasons advanced by the Governor, and offer their own explanations of why they believe those reasons are false, faulty, or flawed. *See* Plaintiffs' Reply Mem. (Dkt. #15). As the court in *Mason v. Casey* stated, however, "[i]t is clear that many factors must be considered in deciding the issue of when an election for a vacancy should take place, and these factors are peculiarly within the discretion of the state." 1991 WL 185243, at *2. In any event, the reasons given by the Governor are not fanciful. They appear to be reasonable and address legitimate concerns. It is not the proper role of this Court to substitute its judgment about those factors for that of the Governor. My task is limited to determining whether the Governor has violated his duties, or plaintiffs' rights, under the United States Constitution, and I conclude that he has not done so.[7]

I also note that plaintiffs have pointed out that when vacancies arose in the Twentieth and Twenty-Third Districts in New York during 2009, the Governor called special elections four weeks, and eight days later, respectively. The Governor, however, does not deny that he *could* proclaim a special election in the 29th District before October 2010, or that he could have done so already, for that matter. He simply contends that given the factors and circumstances outlined above, he has concluded that it would be advisable to wait until October, so that the special

---

[7]Plaintiffs also contend that the Court should disregard the declarations of the three county board of elections commissioners, on the ground that their individual declarations do not constitute authorized or official communications of their respective boards of elections. *See* N.Y. Elec. L. § 3-200(2) (each county board of elections shall consist of at least two, and at most four, election commissioners), and § 3-212(2) ("All actions of the board shall require a majority vote of the commissioners prescribed by law for such board"). Regardless of whether these individuals are empowered to speak on behalf of their respective boards, however, they are clearly competent to testify about the factual matters set forth in their declarations, and their statements are entitled to some weight.

election can coincide with the general election.  Again, this Court will not second-guess that judgment.  *See Mason*, 1991 WL 185243, at *2 (state legislature's and governor's decision to hold special election after general election was "constitutional as long as the resulting delay serves a legitimate purpose," which it did).[8]

Lastly, plaintiffs have alleged that their equal protection rights, as well as their right to congressional representation, are being violated, because at the moment they have no one to represent them in the House.  The short answer to that is that the Constitution specifically addresses situations in which a vacancy exists in the House.  It provides that the Governor must call for a special election, but that the timing of that election is up to the Governor and the state to decide.  Although there may be cases in which such an extraordinary amount of time passes from the existence of the vacancy to the issuance of the proclamation that it amounts to a *de facto* refusal to call a special election at all, *see Ogilvie*, 426 F.2d at 1337 (delay may eventually render the calling of a special election virtually useless), that is not the situation before me.  The winner of the November 2 special election will presumably take office almost immediately after that date, and although plaintiffs might prefer that to occur sooner, I do not believe that the delay here is so long as to amount to a constitutional violation.  *See Mason*,1991 WL 185243, at *3 (dismissing plaintiffs' claim that delay in filling congressional vacancy operated as an infringement of their right to be represented in Congress, on ground that "[s]tates have a

---

[8]I also note that while the special election in the 23rd District was proclaimed only eight days after the vacancy arose on September 21, 2009, the timing of that proclamation on September 29 allowed the special election to be held on the same day as the 2009 general election.  *See* Pearlman Decl. (Dkt. #13) ¶ 8.  The Governor's actions with respect to that vacancy, then, are consistent with, and tend to support, his asserted belief that it is preferable to hold the special and general elections on the same day.

compelling interest in safeguarding the sanctity of the democratic process and the Constitution has given the states the power to decide how to fill vacancies by balancing the competing interests of speed and an informed electorate in picking the date for an election to fill a vacancy").

**D. Remedy**

Despite the Court's finding that no constitutional violation has as yet occurred here, and that plaintiffs are therefore not entitled to the mandatory injunctive relief that they seek, I nonetheless conclude that plaintiffs are entitled to a declaratory judgment, in order to establish clearly that the Governor has a mandatory duty under the Constitution to proclaim a special election to fill a vacancy in any New York State congressional district, including the vacancy that now exists in the 29th District. *See Taft*, 385 F.3d at 646-47, 651 (remanding for award of appropriate declaratory relief); *Ogilvie*, 426 F.2d at 1337 (stating that if district court were to determine on remand that injunctive relief was not proper, plaintiffs would still be entitled to a declaratory judgment).

For the reasons stated above, I conclude that it is within the Governor's discretion to proclaim a special election on a date which will allow that election to be held on the same day as the general election on November 2, 2010. The Governor does not, however, have discretion to decide against calling a special election at all, nor does he have discretion to delay the special election beyond that date, as to do so would run a serious risk of "render[ing] the calling of a

special election of so little use that the duty [to call it] will no longer be enforceable." *Ogilvie*, 426 F.2d at 1337.

**CONCLUSION**

Plaintiffs' motion for injunctive and declaratory relief (Dkt. #3) is granted in part and denied in part.

The Court hereby declares, pursuant to 28 U.S.C. § 2201, that defendant David A. Paterson, Governor of New York, has a mandatory duty under Article I, § 2, clause 4 of the United States Constitution to proclaim a special election to fill the vacancy in the House of Representatives that now exists in the Twenty-Ninth New York Congressional District. Consistent with New York Public Officers Law § 42(3) and any other applicable state laws, that proclamation must be made on a date which will allow the special election to be held no later than the date of the general election on November 2, 2010.

In all other respects, plaintiffs' motion is denied. Plaintiffs' motion for an expedited hearing (Dkt. #2) is denied as moot.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      June 4, 2010.